UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Case No. 15-1687 (RJL) |
| ) | |
| $3,435,935 OF FUNDS FROM AL- ) | |
| NASER AIRLINES, et al., ) | |
| ) | |
| Defendants *In Rem*. ) | |

MEMORANDUM OPINION
March _15_, 2024 [Dkt. #34]

This action for forfeiture *in rem* stems from an investigation by the Department of Commerce into a scheme by Al-Naser Airlines of Iraq ("Al Naser") to evade U.S. export controls and sanctions by illicitly procuring U.S.-origin aircraft for the benefit of an Iranian airline. Following that investigation, the United States commenced this suit against the *in rem* defendants, seeking the forfeiture of roughly $17 million in funds that represent the laundered payments involved in Al-Naser's criminal activities. Before the Court is the United States' motion for default judgment and for an order of forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) and (C), Federal Rule of Civil Procedure 55(b), and Rule G of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions. For the reasons that follow, the United States' motion is **GRANTED**.

## BACKGROUND[1]

Al Naser is a private Iraqi airline that purports to provide foreign and domestic transportation services to the public. Compl. ¶ 25. Since 2014, it "has acted as a front company" for an Iranian airline, Mahan Air a/k/a Mahan Airways, which has been subject to a Temporary Denial Order ("TDO") for sixteen continuous years. *Id.* ¶ 39. A TDO is an administrative order issued by the Export Enforcement Office of the Department of Commerce that broadly denies the export privileges of a company or individual, cutting off the right to buy, sell, receive, use, or otherwise benefit from U.S.-origin exports. *Id.* ¶¶ 34, 36. In Mahan Air's case, the TDO prohibits Mahan Air—or any other party "acting for or on [its] behalf"—from participating in any transactions that involve a U.S.-origin item, specifically including aircraft, aircraft parts and electronics, and other aviation-related exports. *Id.* ¶ 36 (internal quotation marks omitted). Owing to its known support of terrorist groups, Mahan Air is also subject to sanctions by the Office of Foreign Assets Control ("OFAC"), which similarly forbids Mahan Air from obtaining any U.S.-origin exports. *Id.* ¶¶ 37–38.

Nevertheless, over an eight-month period between 2014 and 2015, Al Naser and related entities spent more than $75 million trying to circumvent Mahan Air's TDO and OFAC's sanctions against it—and ultimately succeeding in part. *Id.* ¶ 40. Although law enforcement officials thwarted Al Naser's attempt to export three U.S.-origin aircraft to

---

[1] On a motion for default judgment following the entry of default, courts construe the well-pleaded allegations of the complaint as admitted. *United States v. Twenty-Four Cryptocurrency Accounts*, 473 F. Supp. 3d 1, 3 n.1 (D.D.C. 2020).

Mahan Air, nine other aircraft slipped the net and were delivered to Mahan Air in May 2015, in violation of its TDO and a host of other U.S. laws and regulations. *Id.* ¶ 41; *see id.* ¶¶ 5–21 (listing the U.S. laws violated by Al Naser's activities, including the money laundering statute, smuggling statute, and International Emergency Economic Powers Act). In self-congratulatory press releases and news reports, Mahan Air and the Iranian government confirmed the acquisition of these aircraft, boasting of Mahan Air's "explosive growth" and the addition of "9 modern aircrafts" to its fleet. *Id.* ¶¶ 43–44. To this day, at least two of the U.S.-origin aircraft that Al Naser unlawfully procured for Mahan Air continue to serve in the Iranian airline's fleet. *Id.* ¶ 84.

The subsequent investigation revealed that Al Naser used sophisticated techniques to prevent detection of its illicit procurement scheme on behalf of Mahan Air, including aliases, shell companies, offshore accounts, forged documents, false statements, and witting and unwitting intermediaries. *Id.* ¶¶ 113–114. These techniques frustrated due diligence efforts by aircraft sellers and financial institutions and concealed the true destination of the aircraft, as well as Al Naser's significant ties to Mahan Air. *Id.* Indeed, as described in the verified complaint, the evidence of Al Naser's criminal business dealings with Mahan Air is pervasive. Bank records, financial accounts, purchase and lease agreements, and intercepted communications between Al Naser and Mahan Air officials betray Al Naser's long history of buying used U.S.-origin aircraft for onward delivery to Iran, *id.* ¶¶ 75–89—including (but almost certainly not limited to) the twelve aircraft identified by their manufacturer serial numbers ("MSNs") in the verified complaint, *id.* ¶ 41.

Following its investigation into these activities, the United States filed its complaint for forfeiture *in rem*. The three *in rem* defendants are alleged to represent the laundered payments involved in Al Naser's scheme to procure four of the twelve identified aircraft: $3,435,935 of Funds from Al-Naser Airlines, which comprise Al Naser's payment for two aircraft (MSNs 082 and 099) and its deposit on a third aircraft (MSN 317); $11,000,000 of Funds in the Name of German Aviation Capital for the Benefit of Al-Naser Airlines, which represent part of Al Naser's payment for a fourth aircraft (MSN 615); and $2,600,000 of Funds in the Name of German Aviation Capital for the Benefit of Al-Naser Airlines, representing the other part of Al Naser's payment for the same aircraft (MSN 615). *Id.* ¶ 45. The complaint alleges that these funds are subject to forfeiture because they "constitute[] or [are] derived from proceeds traceable to a violation" of multiple U.S. statutes, 18 U.S.C. § 981(a)(1)(A), (C)—namely, the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705 et seq.; the smuggling statute, 18 U.S.C. § 554(a); and the money laundering statute, *id.* § 981(a)(1)(A); as well as a legion of other laws, including the conspiracy statute, Mahan Air's TDO, OFAC's export sanctions, and the Export Administration Regulations. *See* Compl. ¶¶ 5–21, 116–117, 119–120.

As required by the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"), the United States posted public notice of its forfeiture action on http://www.forfeiture.gov for thirty days between February 25 and March 26, 2020. Mem. Supp. United States' Mot. Entry of Default J. & Order of Forfeiture [Dkt. #34-1] ("Mot. Default J.") at 7. By email and certified mail, the Government also sent direct notice of the action to all known potential claimants at over a

4

dozen different addresses. *Id.* at 7–9. Only one potential claimant, German Aviation Capital, responded to these notices and communicated an interest in a portion of the *in rem* funds. *Id.* at 3. German Aviation Capital has since settled its interest in the funds to the tune of roughly $6 million. *See* Notice of Filing Settlement Agreement [Dkt. #31].

As for the rest of the potential claimants, the United States filed an affidavit for default in November 2023. It explained that, other than German Aviation Capital, no person or entity had filed a claim to the *in rem* defendant funds and the time for filing any claim had long expired. *See* Request for Entry of Default [Dkt. #32]; Decl. Supp. Default [Dkt. #32-1] ("Datta Decl."). After the Clerk of the Court entered default against the *in rem* defendants and any additional claimants, *see* Entry of Default [Dkt. #33], the Government filed the instant motion for default judgment and for a final order of forfeiture. *See generally* Mot. Default J. The motion is now ripe for review.

## LEGAL STANDARD

The Federal Rules of Civil Procedure empower a district court to enter default judgment against a defendant that fails to defend its case. Fed. R. Civ. P. 55(b)(2). Under those rules, obtaining default judgment is a two-step process. *See, e.g., Bricklayers & Trowel Trades Int'l Pension Fund v. KAFKA Constr., Inc.*, 273 F. Supp. 3d 177, 179 (D.D.C. 2017). First, the plaintiff must request that the Clerk of Court enter default against a party who has "failed to plead or otherwise defend." Fed. R. Civ. P. 55(a). The Clerk's entry of default amounts to the defendant's "admission of the facts cited in the Complaint, which by themselves may or may not be sufficient to establish a defendant's liability." *Jackson v. Corr. Corp. of Am.*, 564 F. Supp. 2d 22, 27 (D.D.C. 2008) (internal quotation

marks omitted). Second, the plaintiff must apply to the court for a default judgment. Fed. R. Civ. P. 55(b). This requires the plaintiff to prove its entitlement to the relief requested. After all, "the defendants' default notwithstanding," a plaintiff's application for default judgment "cannot stand on a complaint that fails to state a claim." *Jackson*, 564 F. Supp. 2d at 27 (internal quotation marks omitted).

In civil forfeiture actions, the question of whether a complaint states a valid claim is governed by Rule G of the Supplemental Rules. Rule G(2) requires the complaint to be verified, state the grounds for jurisdiction, describe the property "with reasonable particularity," identify the statute under which the action is brought, and "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Fed. R. Civ. P. Supp. AMC R. G(2). In addition, under Rule G(4), the Government must show that it complied with the Rule's notice requirements for potential claimants. So long as the United States establishes both notice and the adequacy of its complaint, it will have met its burden for a default judgment.

## DISCUSSION

### I. Notice

Supplemental Rule G(4) requires the Government to provide two forms of notice to potential claimants in a forfeiture action *in rem*. The first form is notice to the public via publication. Such notice must describe the property, state the time to file a claim and answer, and name the Government attorney who must be served. Fed. R. Civ. P. Supp. AMC R. G(4)(a)(ii). Notice by publication is sufficient if, among other options provided by Rule G(4), it is posted "on an official internet government forfeiture site for at least 30

consecutive days." Fed. R. Civ. P. Supp. AMC R. G(4)(a)(iv)(C). Here, the Government published notice of its forfeiture proceeding on http://www.forfeiture.gov for thirty consecutive days, starting on February 25 and ending on March 26, 2020. Mot. Default J. at 7; Datta Decl. ¶ 8. After describing the *in rem* defendants, the notice stated that "[a]ny person claiming a legal interest in the [above] Defendant Property must file a verified Claim with the court within 60 days from the first day of publication (February 25, 2020) … and an Answer to the complaint … within 21 days thereafter." Publ'n Decl. [Dkt. #30], Attach. 1. The notice also identified the Assistant U.S. Attorney on whom the claim and answer must be served. *Id.* No claims, timely or otherwise, were filed in response to this Internet posting. Datta Decl. ¶ 8. These efforts plainly satisfy the Government's obligation to provide notice by publication.

The second form of notice required by Rule G(4) is direct notice "to any person who reasonably appears to be a potential claimant." Fed. R. Civ. P. Supp. AMC R. G(4)(b)(i). Like notice by publication, the direct notice must identify the deadline for filing a claim and answer and name the Government attorney to be served; it must also include a copy of the complaint. Fed. R. Civ. P. Supp. AMC R. G(4)(b)(ii). Direct notice is sufficient if it is sent "by any means reasonably calculated to reach the potential claimant," Fed. R. Civ. P. Supp. AMC R. G(4)(b)(iii)(A), although this does not demand that the Government "demonstrate [] it was successful in providing actual notice." *Twenty-Four Cryptocurrency Accounts*, 473 F. Supp. 3d at 5 (internal quotation marks omitted). Rather, the Government need only "attempt" to give direct notice to a claimant, which it may do through any number of media, such as mail and email. *Id.* (internal quotation marks

omitted).

Here again, the Government has fulfilled its notice obligations. Based on its investigation, the Government identified and obtained contact information for seven potential claimants at sixteen different addresses, including the addresses of U.S.-based lawyers who represented claimants in the past. Mot. Default J. at 7–9. All seven claimants received at least one direct notice and a copy of the complaint via Federal Express or the U.S. Postal Service; three of these claimants also received emails, and all but one were sent multiple direct notices by multiple mailings. *Id.*; Datta Decl. ¶¶ 7–9. The notices advised that they must file a verified claim and serve it on the named Assistant U.S. Attorney within 35 days of service—"in the aggregate, no later than May 21, 2020." Datta Decl. ¶ 8. No claims, timely or otherwise, were filed in response to these direct notices, although German Aviation Capital did indicate an interest in the *in rem* defendant funds—an interest that it later settled with the United States. *Id.* ¶¶ 8, 10. The Government's mailings on this front clearly meet the Supplemental Rules' direct notice requirements.[2]

## II. Adequacy of the Complaint

In addition to notice under Rule G(4), the Government must also demonstrate that its complaint is sufficient under Rule G(2) before a default judgment is entered. Four of Rule G(2)'s requirements "are largely formal," *MingZheng Int'l*, 324 F. Supp. 3d at 48,

---

[2] The Government does not suggest that any of its mailings were returned as undelivered or otherwise unsuccessful at providing direct notice to the seven identified claimants. Even if some were, however, the Government's notice by publication combined with its attempt at direct notice would satisfy the notice requirements. *See Twenty-Four Cryptocurrency Accounts*, 473 F. Supp. 3d at 6; *United States v. $1,071,251.44 of Funds Associated with MingZheng Int'l Trading Ltd.*, 324 F. Supp. 3d 38, 47 (D.D.C. 2018).

8

and are handily met in this case. The Government's complaint is verified. *See generally* Compl. It identifies the bases for jurisdiction and venue. *Id.* ¶¶ 3–4.[3] It describes the property by giving the specific amount of funds representing each of Al Naser's laundered payments for the four aircraft at issue (MSNs 082, 099, 317, 615), as well as details surrounding the transactions in which those payments were made. *Id.* ¶ 45. And it states the provisions under which forfeiture is sought, *id.* ¶¶ 2, 117, 120—namely, 18 U.S.C. § 981(a)(1)(C), which permits forfeiture of property traceable to a violation of IEEPA and the smuggling statute, and 18 U.S.C. § 981(a)(1)(A), which permits forfeiture of property involved in money laundering.

The fifth and last of Rule G(2)'s requirements for an adequate complaint is more substantive. *MingZheng Int'l*, 324 F. Supp. 3d at 48. It requires the Government to provide "sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Fed. R. Civ. P. Supp. AMC R. G(2)(f). But the complaint here undoubtedly satisfies that standard. Across nearly 40 pages, it describes in detail a scheme by Al Naser and related entities to illicitly procure U.S.-origin aircraft for the benefit of an Iranian airline, Mahan Air, which was prohibited from obtaining any U.S.-origin exports. The Government explains that Al Naser was able to carry out this scheme only by employing sophisticated money laundering techniques and other illegal methods

---

[3] This Court has jurisdiction over "any action or proceeding for the recovery or enforcement of any ... forfeiture ... incurred under any Act of Congress, 28 U.S.C. § 1355—in this case, 18 U.S.C. § 981. Venue in the District of Columbia is proper as well, because Al Naser used the *in rem* funds in transactions for which it was required to seek authorization from OFAC, which is located in D.C. Compl. ¶ 4. The District is therefore the location where the "acts or omissions giving rise to the forfeiture occurred." 28 U.S.C. § 1355(b)(1)(A). It is also the judicial district into which at least some of the *in rem* defendant funds were brought after being seized. 28 U.S.C. § 1395(c); *see* Compl. ¶ 4.

of evasion, such as making false statements and forging documents, to circumvent the U.S. controls and sanctions imposed on Mahan Air. The complaint then alleges that the named *in rem* defendants represent the over $17 million in laundered payments that Al Naser made when it purchased four of the twelve total U.S.-origin aircraft that it procured or attempted to procure for Mahan Air. And the complaint goes on to inventory the many U.S. laws and regulations that Al Naser violated with these criminal business dealings, including the smuggling statute, money laundering statute, and IEEPA—all three of which provide a legal basis for forfeiture of the *in rem* funds.

These verified allegations establish the facts necessary to support a civil forfeiture under 18 U.S.C. § 981(a)(1)(A) and (C). Accordingly, the requirements of Supplemental Rule G(2) are satisfied, and the United States is entitled to a default judgment.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** the United States' motion for default judgment. An order consistent with this decision and a final order of forfeiture accompanies this Memorandum Opinion.

**SO ORDERED.**

RICHARD J. LEON
United States District Judge